# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-24-00097-CR

---

**The State of Texas, Appellant**

**v.**

**Kenneth Earl Norris, Appellee**

---

### FROM THE COMAL COURT AT LAW NO. 3 OF COMAL COUNTY
### NO. 2022CR0317, THE HONORABLE DEBORAH WIGINGTON, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellee Kenneth Earl Norris was charged with driving while intoxicated (DWI), with a blood-alcohol-concentration level of 0.15 or more. *See* Tex. Penal Code §§ 49.04(a), (d). He filed a pretrial motion to suppress evidence obtained during the stop and ensuing investigation. After conducting a hearing, the trial court granted the motion. The trial court denied the State's motion for reconsideration and entered findings of fact and conclusions of law. The State contends that the trial court abused its discretion by granting the motion to suppress and denying its motion for reconsideration because reasonable suspicion existed for the stop. We disagree and affirm.

## BACKGROUND

Comal County Sheriff's Office Deputy Kyle Salisbury was the State's only witness at the suppression hearing. His offense report, affidavit for warrantless arrest, video

from his dashboard- and body-cameras, video of a blood draw from Norris, and video from Deputy Patrick Byrne's dashboard-camera—who arrived on the scene after the initial stop of Norris—were admitted into evidence. Deputy Salisbury testified that at approximately 10:45 pm on a Friday, he was in the process of completing a separate traffic stop on North Park Road, about two or three car lengths away from the intersection of North Park and FM 306 when "the driving behavior" of another driver—Norris—got his attention.

Norris was driving his truck down FM 306 when he turned right on North Park. North Park had one lane and a shoulder for each direction of travel. Deputy Salisbury's patrol car was parked on the side of the road partially in the right-hand lane. Deputy Salisbury was at the driver's door of the car that he had pulled over in front of his patrol car, which placed Deputy Salisbury in the road. A sound can be heard both on Deputy Salisbury's dash-cam and body-cam videos. In the body cam video, the already pulled over driver said, "Whoa," in response to the sound. Deputy Salisbury first turned his head and then his body in the direction of the noise. Norris's vehicle becomes visible on the body-cam footage about three seconds after the sound is heard. The truck was driven very slowly on the opposite side of the road, passing Deputy Salisbury's car, and then beginning to pass Deputy Salisbury. Deputy Salisbury then walked further into the road towards Norris's truck, shouted, "Stop," and slapped the hood of Norris's truck.

Deputy Salisbury asked, "What are you doing?" Norris answered, "I'm going around you." Deputy Salisbury told Norris, "You almost hit the back of my car." Norris replied, "I saw you." In response to being asked where he was coming from, Norris answered "Lucky's," which Deputy Salisbury testified was a bar that he knew was in the direction that Norris was coming from. Deputy Salisbury directed Norris to pull over and quickly concluded

2

the traffic stop that had been interrupted. Deputy Salisbury performed a series of standardized field sobriety tests and arrested Norris for DWI. A blood sample was seized from him pursuant to a warrant.

At the hearing, Deputy Salisbury testified that he "heard a vehicle rapidly decelerate in the form of tires screeching," and "looked and saw a large pickup had abruptly stopped pretty close to the back of [his] car, almost as if they had misjudged the speed to the turn." He recognized these as cues of intoxication from his training. He described the turn as "erratic" and "sharp." He testified that there was not anything that would have obstructed Norris's view of his patrol car from FM 306. On cross-examination, Deputy Salisbury agreed that there was nothing illegal about the turn including the hard braking and that it was neither "too wide" nor "too narrow" a turn. He explained that the turn was "sharp" and "wasn't smooth," which caused him to suspect that the driver was intoxicated. Deputy Salisbury agreed that when Norris went around him in the opposite lane, it was done in a lawful manner. Deputy Salisbury testified that when he slapped the truck and said, "Stop," Norris was not free to go and was detained.

Deputy Salisbury testified that he wrote the offense report within 48 hours of the traffic stop and the affidavit for warrantless arrest the same night that he stopped and arrested Norris. Neither the report nor affidavit mentioned that Norris's truck nearly collided with Deputy Salisbury's car or stopped behind it or mentioned that before stopping Norris, Deputy Salisbury knew Norris was coming from a direction that included a bar. The affidavit mentioned "screeching tires" and a "sharp turn" as the reasons for the stop. The report stated that Deputy Salisbury "heard a vehicle on FM 306 screech its tires," which "made a sharp right turn onto North Park Road and began driving towards me driving down the middle of the unmarked road."

3

The report explained that Deputy Salisbury "told the driver to stop and began speaking with him" because of "the vehicle's driving behavior." The affidavit also stated that "the driver of the truck . . . began driving down the middle of the undivided road" and that Deputy Salisbury "signaled for the driver of the vehicle to stop." In the video exhibits, it is apparent that the road was not "undivided" or "unmarked," and that Norris was driving within the opposite lane to go around the traffic stop that was in progress. Deputy Salisbury confirmed on cross-examination that the video depicts him slapping the car, but he did not include that in his report or affidavit. He also confirmed that slapping a vehicle was not part of his training. When asked why he did so, he explained that it was for his own safety because he was not sure if Norris had seen him standing in the road. He also testified that he did not "yell" when he "told" Norris to stop.

Deputy Byrne arrived on the scene after the DWI investigation of Norris had begun and the first driver had left. His dash-cam video shows the view of the intersection of FM 306 and North Park but coming from the opposite direction that Norris had on FM 306 and turning left instead of right onto North Park. Deputy Byrne's dash-cam video depicts that it was drizzling or raining when he arrived on the scene. Deputy Salisbury testified that it was "humid" at the time of the stop.

After the hearing, the trial court granted Norris's motion to suppress "based on a lack of reasonable suspicion to stop the Defendant." The state filed a motion for reconsideration and the trial court held an additional hearing at which it invited additional briefing on the issue. The trial court denied the State's motion for reconsideration. The trial court made extensive findings of fact and conclusions of law, including the following credibility determinations:

31. This Court specifically finds Deputy Salisbury to not be credible concerning his testimony that Mr. Norris came close to striking the back of the Deputy's vehicle due to both his written recollection from the event and from the indisputable body camera footage.

32. Deputy Salisbury's lack of credibility concerning his written recollection comes from the fact that in his Probable Cause Affidavit and in his Police Reports (that he testified he completes within 48 hours of an arrest) do not mention a near collision or Mr. Norris' vehicle coming near the back of the Deputy's patrol car.

33. Specifically, Deputy Salisbury's Probable Cause Affidavit reads as follows: "While on an unrelated traffic stop at FM 306/ North Park Road, I heard tires screeching near FM 306. I turned around looked towards FM 306 and observed a silver truck turning sharply onto North Park Lane coming my direction. The driver of the truck turned onto North Park Road sharply and began driving down the middle of the undivided road approaching me. I signaled for the driver of the vehicle to stop."

34. This Court finds that the indisputable video evidence shows that the roadway is in fact "marked" and that the Defendant did not come close to hitting the back of the Deputy's patrol vehicle.

. . . .

36. The footage [of the first time that Norris's vehicle can be seen on video] is immediately following the Deputy hearing the tires, seeing Mr. Norris take a sharp right turn, and the Deputy turning to face the intersection with his body camera.

37. This takes place within three seconds.

38. Deputy Salisbury's vehicle is partially on the roadway with his patrol lights activated.

39. The yellowish lights to the right of the picture are from the truck driven by Mr. Norris.

40. The indisputable visual evidence clearly shows Mr. Norris on the outside lane slowly going around the Deputy's vehicle.

41. This Court finds that Mr. Norris could not have applied his brakes on FM 306, then taken a sharp right-hand turn, then come dangerously close to colliding with the back of the patrol car, and then maneuvered from

5

close behind the Deputy's car to fully into the other lane within three seconds.

42. The Deputy claimed that he was standing in the roadway when he slapped on Mr. Norris' vehicle.

43. The video clearly shows that the Deputy was not "standing in the roadway'. He actually walked towards Mr. Norris' vehicle to slap on it while yelling "Stop!"[1]

. . . .

This Court does not find Deputy Salisbury credible on his observation that the Defendant's driving was suspicious or indicative of Driving While Intoxicated or any other criminal activity based on the totality of the circumstances.

. . . .

The Court does not find Deputy Salisbury credible concerning his testimony about Mr. Norris almost hitting the back of his patrol car.

Based on these findings, the trial court concluded that Deputy Salisbury lacked reasonable suspicion to stop Norris. The State appeals the trial court's order granting Norris's motion to suppress and denying its motion for reconsideration.

## STANDARD OF REVIEW

We review a trial court's ruling on a motion to suppress evidence for an abuse of discretion using a bifurcated standard. *State v. Espinosa*, 666 S.W.3d 659, 667 (Tex. Crim. App. 2023). A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement, is arbitrary or unreasonable, or is without reference to any guiding rules or principles. *State v. Thomas*, 428 S.W.3d 99, 103 (Tex. Crim. App. 2014); *State v. Mechler*,

---

[1] We note that the video shows Deputy Salisbury in the road during the traffic stop and then walking further into the road to slap Norris's car, which was in the other lane.

6

153 S.W.3d 435, 439–40 (Tex. Crim. App. 2005) (citing *Montgomery v. State*, 810 S.W.2d 372, 378–79 (Tex. Crim. App. 1990)).  In a suppression hearing, the trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony.  *Lerma v. State*, 543 S.W.3d 184, 190 (Tex. Crim. App. 2018).  We therefore defer to a trial court's findings of fact that are supported by the record.  *Espinosa*, 666 S.W.3d at 667.  Likewise, we afford almost total deference to a trial court's rulings on mixed questions of law and fact if the resolution to those questions turns on the evaluation of credibility and demeanor.  *State v. Hardin*, 664 S.W.3d 867, 871–72 (Tex. Crim. App. 2022).  We review de novo legal questions, such as the construction of a statute, and mixed questions that do not turn on credibility and demeanor.  *Espinosa*, 666 S.W.3d at 667; *Hardin*, 664 S.W.3d at 872.  The evidence and all reasonable inferences are viewed in the light most favorable to the trial court's ruling, which must be upheld if it is reasonably supported by the record and is correct under a theory of law applicable to the case.  *Espinosa*, 666 S.W.3d at 667.

A deferential standard also applies when a trial court's findings of historical fact are based on a video's contents, over which there is a factual dispute.  *Miller v. State*, 393 S.W.3d 255, 263 (Tex. Crim. App. 2012).  However, "indisputable video evidence" may be reviewed de novo, unless the trial court's findings concern "whether a witness actually saw what was depicted on a videotape."  *State v. Duran*, 396 S.W.3d 563, 571 (Tex. Crim. App. 2013); *see Carmouche v. State*, 10 S.W.3d 323, 332 (Tex. Crim. App. 2000) ("[T]he nature of the evidence presented in the videotape does not pivot 'on an evaluation of credibility and demeanor.'  Rather, the videotape presents indisputable visual evidence contradicting essential portions of [the officer's] testimony.  In these narrow circumstances, we cannot blind ourselves to the videotape

7

evidence simply because [the officer's] testimony may, by itself, be read to support the Court of Appeals' holding.").

"When a police officer stops a defendant without a warrant, the State has the burden of proving the reasonableness of the stop at a suppression hearing." *State v. Cortez*, 543 S.W.3d 198, 204 (Tex. Crim. App. 2018). "An officer may make a warrantless traffic stop if the 'reasonable suspicion' standard is satisfied." *Jaganathan v. State*, 479 S.W.3d 244, 247 (Tex. Crim. App. 2015) (citing *Guerra v. State*, 432 S.W.3d 905, 911 (Tex. Crim. App. 2014)). "'Reasonable suspicion' means 'a particularized and objective basis for suspecting the particular person . . . of criminal activity.'" *Johnson v. State*, 622 S.W.3d 378, 384 (Tex. Crim. App. 2021) (quoting *Kansas v. Glover*, 589 U.S. 376, 380 (2020)). It exists if an officer "has specific articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably suspect that a particular person has engaged or is (or soon will be) engaged in criminal activity." *Cortez*, 543 S.W.3d at 204. "The articulable facts need only show that some activity out of the ordinary has occurred, some suggestion to connect the detainee to the unusual activity, and some indication that the unusual activity is related to crime." *Johnson*, 622 S.W.3d at 384. The detaining officer does not need to be able to pinpoint a particular penal infraction or establish that a defendant committed a crime. *Id.*; *Derichsweiler v. State*, 348 S.W.3d 906, 916 (Tex. Crim. App. 2011); *Martinez v. State*, 348 S.W.3d 919, 923 (Tex. Crim. App. 2011); *see Guerra*, 432 S.W.3d at 912 ("It is not necessary that the reasonable suspicion relate to a specific criminal offense."). Reasonable suspicion requires only "'some minimal level of objective justification' for the stop." *Hamal v. State*, 390 S.W.3d 302, 306 (Tex. Crim. App. 2012) (quoting *Foster v. State*, 326 S.W.3d 609, 614 (Tex. Crim. App. 2010)). This means a level of suspicion more than a mere "hunch" but less than probable cause. *Johnson*, 622 S.W.3d at 384.

8

The test for reasonable suspicion looks at the totality of the circumstances and focuses "solely on whether an objective basis exists for the detention," disregarding the officer's subjective intent. *State v. Kerwick*, 393 S.W.3d 270, 274 (Tex. Crim. App. 2013); *see State v. Elias*, 339 S.W.3d 667, 675 (Tex. Crim. App. 2011) ("[I]t does not matter whether the objective facts support a detention for the specific offense [the officer] intended to detain the appellee for as long as the facts otherwise objectively support a detention for some offense.").

Our inquiry into reasonable suspicion is "multi-faceted," and determinations made in other cases "will seldom be a useful precedent for another." *Ornelas v. United States*, 517 U.S. 690, 698 (1996) (cleaned up). Instead, reasonable suspicion is a "commonsense, nontechnical conception[ ] that deal[s] with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Id.* (cleaned up). The facts are judged under "an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968). Thus, we should avoid a formulaic approach or a piecemeal comparison of similar factors in other cases and instead consider the totality of the circumstances in this case and rely on commonsense inferences and deductions about the cumulative information available to the deputy at the time of the stop. *Tanner v. State*, 228 S.W.3d 852, 857 (Tex. App.—Austin 2007, no pet.).

**DISCUSSION**

The State contends that the trial court erred when it granted Norris's motion to suppress. It contends that at the time the deputy slapped Norris's truck and said, "Stop," he had reasonable suspicion that Norris had just committed reckless driving, failure to control speed, an

9

unsafe turn, or disorderly conduct. *See* Tex. Transp. Code §§ 545.103, .351(a), (b), .401; Tex. Penal Code § 42.01(a)(5). The State also contends that the deputy had reasonable suspicion that Norris was driving while intoxicated because, as the State views the evidence, it was late at night (10:45 pm), his tires screeched, he nearly hit the parked patrol car with its lights flashing, and he was driving from a direction that includes bars. The State urges that if Norris was not intoxicated, he would have seen the deputy's unobstructed parked patrol car with flashing lights prior to making the turn and would not have had to brake so hard as to make his tires screech.

In response, Norris contends that none of that is supported by the record. He contends that there is no evidence of the speed of his truck as he approached the intersection, of what caused the sound on the video, of a "near collision," or that he had an unobstructed view.

The State relies heavily on its contention that Norris nearly collided with the deputy's patrol car. However, the trial court made a contrary factual finding and found the deputy's testimony regarding how Norris's truck took the turn was not credible. The trial court made the credibility findings—after viewing the video evidence, reading the reports, and hearing the deputy's live testimony during the hearing—that Deputy Salisbury's observations regarding Norris's driving being suspicious or indicative of driving while intoxicated or any other criminal activity or that Norris almost hit the back of his patrol car were not credible. Because the credibility determination was made based at least partially on the deputy's live testimony and is not contradicted by the video, we give deference to the trial court's credibility finding. *Miller*, 393 S.W.3d at 263. Notably, Deputy Salisbury agreed when asked whether Norris's driving was otherwise lawful and clarified that the stop was not about a traffic violation but suspicion of DWI. Outside of the deputy's testimony of suspicious driving behavior and assertion that Norris nearly hit his vehicle, which the trial court determined was not credible, the remaining evidence

in the record and known to the deputy at the time of the stop is that Norris's vehicle made a noise while he turned, that it was 10:45 pm on a Friday night, and that he was traveling from the direction where bars are located.

Applying the applicable standard, we conclude that the trial court did not abuse its discretion by granting Norris's motion to suppress and denying the State's motion for reconsideration.

The State requests that we abate and remand this case to the trial court for additional factual findings. *See State v. Mendoza*, 365 S.W.3d 666, 671–73 (Tex. Crim. App. 2012). First, the State requests that we abate because it contends that the trial court's findings demonstrate that it applied the wrong legal tests instead of considering the totality of the circumstances. Not only did the trial court's conclusions of law establish that it considered the totality of the circumstances, but we also apply that test de novo. Next, the State contends that the trial court used "weasel words" in its finding, which were disfavored by the Court of Criminal Appeals in *Mendoza*. *Id.* at 671–72. Notably, in the *Mendoza* opinion, the Court of Criminal Appeals reasoned that the trial court's use of "weasel words" such as "believed," "noticed," "felt," and "stated," which were used to describe the officer's testimony, did not adequately support the trial court's factual and credibility findings in favor of the officer's testimony. *Id*. The situation here is distinguishable. Although the trial court made findings with similar language, the words were used to convey the trial court's lack of confidence in the statements and make clear that the trial court was not adopting what Deputy Salisbury "stated" or "testified" as its own finding. This situation is the opposite of the one discussed in *Mendoza*. *See id*. The State also contends that the trial court failed to make essential findings and made findings that were unsupported by the record and internally inconsistent. We understand this

11

contention to be based on the State's disagreement with the trial court's resolution of the conflicts in the evidence and its credibility determinations. However, we already addressed these issues above and concluded that the trial court did not abuse its discretion. Thus, we decline to abate and remand this case to the trial court for it to make additional findings of fact.

We overrule the State's issues challenging the trial court's order of suppression, denial of its motion for reconsideration, and findings of fact.

## CONCLUSION

We affirm the trial court's order of suppression.

_____

Gisela D. Triana, Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed

Filed: October 17, 2025

Do Not Publish